UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PET GIFTS USA, LLC, | Civil Action No: |
| *Plaintiff,* | 14-cv-3884 (PGS)(DEA) |
| v. | |
| IMAGINE THIS COMPANY, LLC, *et al.*, | MEMORANDUM AND ORDER |
| *Defendants.* | |

This matter comes before the Court on Defendants Imagine This Company (hereinafter, "ITC") and Twelve, Inc.'s Motion for Summary Judgment. (ECF No. 99). Having previously dismissed Counts I through V of Plaintiff Pet Gift USA, LLC's Complaint with prejudice (ECF No. 72), Defendants now seek summary judgment dismissal of Plaintiff's remaining claim, Count VI, which alleges trade dress infringement under N.J.S.A. § 56:4-1. For the reasons discussed herein, Defendants' motion for summary judgment is granted.

I.

Plaintiff Pet Gifts, a sole proprietorship that designs and produces animal-themed products, including dog bone and paw magnets, brought this lawsuit against Defendant ITC, alleging trade dress infringement. Pet Gifts describes its magnet trade dress as:

> a) the dimensions of the packaging including the header card; b) shaped to correspond to the bone or paw shaped magnets; c) paw shaped magnets are 5.5" x 5.5" and Bone shaped magnets are 2.25" x 7"; d) thickness is .30 mil; e) humorous slogans provided by Plaintiff; f) the paw magnets are black with a white border and white lettering inside the magnet, the bone magnet are [sic] white with a black border including black "swoosh" symbol and red heart, the header cards are black offset with white lettering with "made in America" printed on the front, as well as "Instructions For Use" on the back.

(Defendants' Statement of Material Facts [SOMF] at ¶ 66). At deposition, Pet Gifts' co-owner, Elicia Kessler, described the trade dress more simply as "a black-and-white header card, a poly bag, stapled on the outside corners by people with disabilities . . . we were identified in the marketplace with this magent in a black-and-white header card attached to a poly bag." (*Id.* at ¶ 68; ECF No. 99-8, "Kessler Deposition" at 103-04).

Since the early 1990s, ITC has sold outdoor novelty car magnets, which it designs and produces at its printing facility. (*Id.* at ¶¶ 6-7). According to ITC, in 2005, it added dog bone and paw shaped car magnets to its production line, which were sold shortly thereafter. (*Id.* at ¶¶ 10-12). "The paw prints consisted of a black paw on a white background, while the bone magnets are depicted in white with [a] black outline." (*Id.* at ¶ 15). Within these magnets, ITC included humorous slogans, such as: "My Cat Tolerates Me," "My Dog Loves Me," and "I Hate My Cat." (*Id.*). In late 2005, ITC also prepared a four-page sales brochure, which depicted the various pet-themed magnets that ITC had to offer. (*Id.* at ¶ 16). The 2005 brochure was part of a marketing effort by ITC to expand its sale to new commercial consumers, primarily retailers. (*Id.* at ¶ 17). As a result of its marketing efforts, ITC distributed bone and paw shaped magnets beginning in 2005; some of these orders were customized, with unique or personalized phrases placed within the magnet, while others were stock items. (*Id.* at ¶ 20). According to ITC, many of its bone and paw shaped magnets were unpackaged and delivered in bulk; however, in late 2005, it began packaging its products, using a shrink-wrapped transparent plastic affixed with a header card that said, "I Love My Pet Magnets." (*Id.* at ¶ 25). An image of this packaging is depicted below:



(*Id.*).

In February 2007, ITC's co-owner, Beverly Moss, met Kessler at the Henrico Pet Expo in Virginia. (*Id.* at ¶ 34). According to ITC, Kessler had learned that another company involved in the novelty pet magnet business purchased its magnets from ITC. (*Id.* at ¶ 33). During this communication, the parties discussed the possibility of Pet Gifts purchasing magnets directly from ITC. (*Id.* at ¶ 34). Over the next few months, ITC and Pet Gifts exchanged emails, regarding orders for pet magnets from ITC's 2005 Brochure. (*Id.* at ¶ 37). On April 23, 2007, Pet Gifts placed its first order from ITC for bone shaped car magnets. (*Id.* at ¶ 44). Prior to preparing the order, ITC sent Pet Gifts a proof sheet to ensure that the magnets would be printed in accordance with Pet Gifts' specifications. (*Id.* at ¶ 45). According to ITC, the proof sheet also included language that stated, "Imagine This Company was reserving for itself the rights and designs that it sells." (*Id.* at ¶ 46). Pet Gifts, however, claims that this language was illegible and it did not understand the proof sheet as reserving ITC with the rights to Pet Gifts' designs. (Plaintiff's SOMF at ¶ 42).

Thereafter, Pet Gifts sought ITC's assistance in printing a paper header card from which Pet Gifts magnets could hang. (Defendants' SOMF at ¶ 51). The design was a black header card, with white font, that said "Magnetic Pedigrees," attached to the header card was a transparent

plastic poly bag, which would contain the magnet. (*Id.* at ¶¶ 52-53). An example of this packaging is depicted below:



A few months later, in August 2007, ITC changed the packaging of its magnets, now utilizing a single sheet of rigid vinyl, finished with a dark blue header and white font, the magnet is inserted within the rigid vinyl, no plastic poly bag is used. (*Id.* at ¶¶ 73-74). An example of this packaging is provided below:



Notably, ITC's name is placed not only on the magnet itself, but also on the back of the packaging.

In May 2008, while attending a trade show, Pet Gifts claims to have discovered that ITC was selling its proprietary designs. (Plaintiff's SOMF at ¶ 48). At this trade show, Pet Gifts learned that ITC was printing and producing Pet Gifts' magnets for another competitor, GoToRovers.com. (Amended Complaint at ¶ 37). According to Pet Gifts, "[t]he magnets [ITC] printed and sold to GoToRovers.com were indistinguishable from Pet Gifts' uniquely designed magnets." (*Id.* at ¶ 38).

On May 29, 2008, ITC received a letter from Pet Gifts, which accused it of "producing an identical line in direct competition with us" and demanded ITC cease selling magnets to GoToRovers.com. (Defendants' SOMF at ¶ 57). The letter later claims, "As you know, it was [Pet Gifts'] idea to develop and produce the humorous paw magnet line." (*Id.* at ¶ 58).

Thereafter, on July 8, 2008, Pet Gifts sent cease and desist letters to two of ITC's sales representatives, GoToRovers.com and Magyar Enterprises. (*Id.* at ¶ 59). The letter also claims that Pet Gifts[1] had filed applications for copyright registration of certain slogans and phrases that it produced; however, this application was denied. (*Id.* at ¶ 60). Nevertheless, after receiving these cease and desist letters, both GoToRovers.com and Magyar Enterprises ended their business relationship with ITC. (*Id.* at ¶ 61).

According to Kessler, she received "a barrage of comments and complaints since customers saw Pet Gifts magnets being sold for cheaper prices." (ECF No. 103-3, "Kessler Declaration" at ¶ 72). As a result, she claims that Pet Gifts has lost business, since ITC is capable of producing and packaging their product at a cheaper cost. (*Id.* at ¶ 73).

---

[1] It should be noted that while the letter concerns Animal Accents' trademark rights, both parties agree that Animal Accents was one of a few entities that Pet Gifts sold its products under.

5

II.

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making

6

all credibility determinations in his favor…that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 F. App'x 222, 227 (3d Cir. 2007).

III.

Defendants move for summary judgment of Pet Gifts' trade dress infringement claim, since it has failed to demonstrate that it is primarily nonfunctional and has acquired secondary meaning. Alternatively, Defendants contend that dismissal is warranted since Pet Gifts claims are contractually barred and beyond the statute of limitations.

Because N.J.S.A. § 56:4-1 is the statutory equivalent of Section 43(a) of the Lanham Act, courts assess New Jersey trade dress infringement claims under the Lanham Act. *See Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 454-55 (D.N.J. 2009); *see also Harlem Wizards Entm't Basketball, Inc. v. NBA Props.*, 952 F. Supp. 1084, 1091 (D.N.J. 1997). "Section 43(a) protects from deceptive imitation not only a business's trademarks, but also its 'trade dress.'" *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 (3d Cir. 2014) (citing 15 U.S.C. § 1125(a)(3)); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 776 (1992) (Stevens, J., concurring). "The purpose of trade dress protection, like trademark protection, is to 'secure the owner of the [trade dress] the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.'" *Shire U.S., Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 353 (3d Cir. 2003) (quoting *Two Pesos, Inc.*, 505 U.S. at 774). Although trade dress historically referred to the packaging and labeling of a product, it has extended to include the product itself. *See Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.*, 963 F.2d 628, 633 (3d Cir. 1992) (quoting *American Greetings Corp. v. Dan-Dee Imports, Inc.*, 807 F.2d 1136, 1140 (3d Cir. 1986)). As such, it "has been defined as the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color or color combinations, texture,

graphics, or even a particular sales technique." *Rose Art Indus. v. Swanson*, 235 F.3d 165, 171 (3d Cir. 2000).

"To establish trade dress infringement under the Lanham Act, a plaintiff must prove that (1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007). "In addition to satisfying these three elements, it is the plaintiff's duty to 'articulat[e] the specific elements which comprise its distinct dress.'" *Fair Wind Sailing, Inc.*, 764 F.3d at 309 (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)). The Court addresses each factor below.

*1. Primarily Nonfunctional*

Defendants first contend that summary judgment is warranted, since Pet Gifts has failed to demonstrate the non-functionality of its claimed trade dress. Pet Gifts responds, arguing that the features of the claimed trade dress are "incidental, arbitrary, or ornamental product features which identify the product's source." (Pl's Brief in Opp. at 12).

The purpose of the functionality doctrine is to strike a balance between protecting manufacturers' interests, while also promoting competition. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163-64 (1995). "It protects the manufacturer (and the consumer) from the copying of those features that signify a product's source (and quality) and encourages competition by preventing one manufacturer from acquiring a monopoly by attempting to trademark those features of a design essential to a successful product of that type." *Shire U.S., Inc.*, 329 F.3d at 353. In *Traffix Devices, Inc. v. Marketing Displays, Inc.*, 523 U.S. 23, 32 (2001), the Supreme Court set forth two tests for determining functionality. First, a product

feature is considered functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id.* (quoting *Qualitex*, 514 U.S. at 165 and *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)). "The key question, as formulated by the Third Circuit, is 'whether a particular feature of a product or service is substantially related to its value as a product or service, i.e., if the feature is part of the function served, or whether the primary value of a particular feature is the identification of the provider.'" *Sweet St. Desserts, Inc. v. Chudleigh's Ltd.*, 69 F. Supp. 3d 530, 543 (E.D. Pa. 2014) (quoting *American Greetings Corp.*, 807 F.2d at 1142).

If the product feature is deemed functional, the feature is not protected and no further inquiry is necessary. *See Traffix*, 532 U.S. at 33. However, if one cannot discern functionality at step one, it must then "consider if there is a competitive necessity for the feature." *Traffix*, 532 U.S. at 33. That is, one must consider whether "the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex*, 514 U.S. at 165. This test is appropriate where, as here, the issue focuses on "aesthetic functionality." *Traffix*, 532 U.S. at 32. "Under the doctrine of aesthetic functionality, visually attractive and pleasing designs are considered to be functional if they are important to the commercial success of the product." *Sweet St. Desserts*, 69 F. Supp. 3d at 543 (citing 1 McCarthy on Trademarks and Unfair Competition § 7:79 (4th ed.)). Here, "the inquiry should focus on the extent to which the design feature is related to the utilitarian function of the product or feature," if it is not, it is entitled to protection if it is inherently distinctive or has acquired secondary meaning. *See Two Pesos, Inc.*, 505 U.S. at 769; *Keene Corp. v. Paraflex Indus.*, 653 F.2d 822, 826 (3d Cir. 1981). Simply put, "[p]roof of nonfunctionality generally requires a showing that the element of the product serves

9

no purpose other than identification." *SK&F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1063 (3d Cir. 1980).

At step one, one must first consider whether the trade dress features are functional. Here, Pet Gifts does not seek protection of the magnets themselves; rather, it seeks trade dress protection based on the following features: the black header card, with white font; the plastic packaging; and the visible magnet. Turning first to the header card and plastic packaging, ITC contends these features are functional, since they enable the product to be hung and enable purchasers to see the product. In addition, ITC contends that the use of white font against a black background captures the concept of aesthetic functionality. This argument is unpersuasive. ITC has failed to demonstrate how any of these features affect the actual function of Pet Gifts' product, a magnet. In fact, another district court has rejected similar arguments, where the defendant argued that the use of header cards and poly plastic bags were functional aspect of the plaintiff's trade dress. *See Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F. Supp. 980, 987 (D. Ariz. 1992). As such, when viewing the functionality of Pet Gifts' trade dress as a whole, the features of the trade dress serve no purpose other than identification. *See American Greetings Corp.*, 807 F.2d at 1142-43.

Turning to step two, Pet Gifts' potential trade dress would not put competitors at a "significant non-reputation-related disadvantage." *Traffix*, 532 U.S. at 32. When considering the features of Pet Gifts' trade dress, if it were to receive protection, it would be limited to prohibiting producers from designing packaging that embodies the same features described above. *See Lisa Frank, Inc.*, 799 F. Supp. 987 (when considering the elements of the plaintiff's trade dress, it "does not result in monopoly protection for necessary elements." (quoting *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 842 n.7 (9th Cir. 1987)). Having

determined that the record demonstrates that Pet Gifts' trade dress is non-functional, the Court next considers whether it has gained secondary meaning.

*2. Secondary Meaning*[2]

The second issue one must consider is whether the trade dress has acquired secondary meaning. At this stage, a plaintiff must show "that the mark is inherently distinctive or has secondary meaning, i.e. there is consumer recognition that the mark identifies the source of the service or product." *Duffy v. Charles Schwab & Co.*, 97 F. Supp. 2d 592, 598 (D.N.J. 2000). "Secondary meaning is demonstrated where, 'in the minds of the public, the primary significance of a product feature or term is to identify the source of the product itself.'" *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 292 (3d Cir. 1991) (quoting *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 152 (3d Cir. 1984)). Here, the inquiry is whether Pet Gifts' trade dress – that is, dog bone and dog paw magnets packed in plastic packaging that are affixed to a black header card with white font – identifies the magnets as Pet Gifts' products. In determining whether secondary meaning has been acquired courts have considered the following factors:

> (1) the extent of sales and advertising leading to buyer association, (2) length of use, (3) exclusivity of use, (4) the fact of copying, (5) customer surveys, (6) customer testimony, (7) the use of the mark in trade journals, (8) the size of the company, (9) the number of sales, (10) the number of customers, and (11) actual confusion

---

[2] Although a trade dress claimant can establish distinctiveness by either demonstrating inherent distinctiveness or secondary meaning, because both parties focus primarily on the secondary meaning element, the Court will as well. Moreover, the Supreme Court has cautioned that "when there are arguments about both product-design and product-packaging trade dress, '[t]o the extent there are close cases, . . . courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning.'" *Buzz Bee Toys, Inc. v. Swimways Corp.*, 20 F. Supp. 3d 483, 498 (D.N.J. 2014) (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 215 (2000)). With this in mind, because Pet Gifts' trade dress claim alleges both product design and product packaging trade dress, the Court will view this issue as a product design trade dress claim.

11

*MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389, 405 (D.N.J. 2008) (citing *Duffy*, 97 F. Supp. 2d at 599).

Having reviewed the record, Pet Gifts has failed to present any competent evidence that creates a genuine issue as to whether the trade dress acquired secondary meaning. Here, Pet Gifts has failed to satisfy any of the enumerated factors to establish that Pet Gifts' trade dress has acquired secondary meaning. Pet Gifts seems to argue that secondary meaning can be inferred by the fact that ITC copied its product and packaging. However, courts have held that the prominent display of a defendant's mark on a similar product refutes an inference that he or she copied the plaintiff's trade dress. *See Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 971 (8th Cir. 1994); *MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d 1198, 1214 (D. Minn. 2007). Here, ITC's products were consistently and clearly labeled with its name, which was prominently featured on both its packaging, as well as on the actual product.

As such, Pet Gifts has failed to establish that it has acquired secondary meaning for its trade dress. The record is bereft of any evidence that Pet Gifts highlights its packaging in ads or that consumers associated its product based on its packaging. In addition, to the extent Pet Gifts' secondary meaning is predicated on ITC's alleged copying, it is undermined by ITC's conspicuous use of its own labels on its products. Because the record fails to establish secondary meaning Pet Gifts' trade dress claim fails. Therefore, summary judgment will be granted.

### ORDER

IT IS on this 29th day of March, 2018,

**ORDERED** that Defendants' motion for summary judgment (ECF No. 99) is **GRANTED**.

PETER G. SHERIDAN, U.S.D.J.